IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| AHMED SOUEIDAN,<br><br>        Plaintiff,<br><br>v.<br><br>ST. LOUIS UNIVERSITY,<br><br>        Defendant. | Civil Action No. _____<br><br>**COMPLAINT**<br>**(Jury Demanded)** |

Plaintiff, AHMED SOUEIDAN (hereinafter referred to as, "Plaintiff" or "Mr. Soueidan"), by and through his undersigned counsel, hereby complains and alleges against Defendant, ST. LOUIS UNIVERSITY ("SLU" OR "Defendant"), based upon knowledge, information and a reasonable belief derived therefrom, as follows:

## INTRODUCTION

This is a case of breach of contract, breach of the covenant of good faith and fair dealing, and fraudulent misrepresentation, by SLU. Mr. Soueidan was a graduate student at SLU seeking a Ph.D. in mechanical and aerospace engineering. While SLU assured Mr. Soueidan that he would receive his Ph.D. in four years, he was unable to obtain more than a second master's degree after following all directives and successfully completing five years of requisite coursework for the Ph.D. program. This was due to SLU's violations of numerous school policies and of state law, all of which made it virtually impossible for Mr. Soueidan to obtain the Ph.D. that SLU promised him.

## PARTIES

1. Plaintiff AHMED SOUEIDAN is a resident of the State of Illinois, and, at all relevant times during the events described herein, was enrolled as a doctoral student at SLU in the Parks College of Engineering, Aviation and Technology.

. . .

1

2. Defendant ST. LOUIS UNIVERSITY, doing business as Saint Louis University Parks College of Engineering, Aviation and Technology ("SLU" or "Defendant"), is a Missouri benevolent corporation with its principal place of business located at 221 North Grand Boulevard, St. Louis, Missouri, which acts by and through its agents, servants and employees, and which receives both state and federal funding.

3. At all times relevant hereto, and in all their actions described herein, Defendant's actions took place in Missouri.

## JURISDICTION AND VENUE

4. Subject matter jurisdiction is invoked pursuant to 28 U.S.C. § 1332 (diversity) because the amount in controversy exceeds $75,000.00, and the parties are diverse.

5. Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because Defendant is located in this District and the facts giving rise to this complaint arose in this District.

6. This Court has supplementary jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to Plaintiff's federal claims that they form a part of the same case or controversy.

## FACTS

7. Mr. Soueidan matriculated to SLU's Parks College of Engineering, Aviation and Technology in 2012 with a Bachelor of Science and a Master of Science degree in mechanical engineering.

8. SLU represented to Mr. Soueidan that he would earn his Ph.D. in mechanical and aerospace engineering in four years.

9. Mr. Soueidan met with the department chair in August 2012 to discuss a plan of study.  This chair drafted a plan for Mr. Soueidan to graduate with his doctoral degree in four years so he followed the plan and enrolled in coursework.

10. Mr. Soueidan then tried to find a Ph.D. advisor who had research or funding, but he could not find anyone willing to accept new graduate students and was even told by one of them that he "should not be in this program."

11. Accordingly, Mr. Soueidan had to complete his first three semesters in the SLU Ph.D. program without an advisor.

12. The following year, in December 2013, Professor Raymond Lebeau agreed to be Mr. Soueidan's Ph.D. advisor and indicated he could get Mr. Soueidan through the program in two more years despite having no research or funding for him.

13. Mr. Lebeau demonstrated great uncertainty with regard to the requisite qualifying examination to move Mr. Soueidan forward in the program so Mr. Soueidan instead referred to the SLU Graduate Student Handbook (hereinafter referred to as, the "Handbook") for guidance. However, Mr. Lebeau told him to disregard the guidelines in the Handbook and to "do it our way," as Mr. Soueidan was "a guinea pig for this program."

14. In August 2014, the graduate coordinator, graduate programs assistant, department chair (who drafted Mr. Soueidan's plan of study), and several professors within the department left SLU simultaneously. One year later, in 2015, the graduate programs assistant and the Dean of the College of Engineering left their positions. By that time, Mr. Soueidan had completed ten graduate-level courses (30 credit hours) to fulfill the course credits requirement for the Ph.D. degree, as shown in the Handbook.

15. In June 2015, Mr. Lebeau indicated to Mr. Soueidan that he needed to attend a conference in order to prepare for the qualifying examination so they submitted a technical abstract to the AIAA SciTech 2016 conference in San Diego, California. Mr. Lebeau and Mr. Soueidan attended this conference in January 2016, and Mr. Soueidan presented his thesis work. Mr. Soueidan paid all conference expenses himself. In the summer 2016, Mr. Soueidan and Mr. Lebeau submitted another technical abstract to the following AIAA SciTech 2017 conference, which was later approved.

16. In May 2016, at the end of his fourth year at SLU, Mr. Soueidan met with the graduate coordinator and Mr. Lebeau to discuss timing of the qualifying examination. A few months later, Mr. Lebeau sent Mr. Soueidan basic notes for preparation. Mr. Lebeau recommended they do a practice exam to prepare for the actual exam. During this practice exam, Mr. Lebeau told

3

Mr. Soueidan after speaking with two of the committee members that he would not pass this exam. Mr. Lebeau also said that the third committee member Mr. Soueidan had chosen had no problem passing him. Mr. Lebeau indicated that he wanted Mr. Soueidan to know this before the actual exam so "bullets wouldn't go flying."

17.     Mr. Soueidan took the actual qualifying examination in August 2016, at the start of his fifth year at SLU. One committee member told Mr. Soueidan before the exam that he did not follow the guidelines to write the paper and questioned his preparation for the exam. Following the exam, Mr. Lebeau told Mr. Soueidan that he "should not have been let in here" because Mr. Lebeau was "not interested in new ideas" and was "afraid of putting [Mr. Soueidan] out there because [Mr. Lebeau] didn't know what [Mr. Lebeau] was doing and didn't want to bear that responsibility."

18.     Mr. Soueidan was then instructed to take a written exam and an additional course. This is the very written exam that Mr. Soueidan had suggested to Mr. Lebeau years prior but was rejected even though it should have been taken within the first year of his Ph.D. studies. Mr. Soueidan enrolled in the additional course suggested by the committee members and also met a second time with the graduate coordinator and Mr. Lebeau to discuss his progress in the program.

19.     During the suggested course in September 2016, another student indicated to Mr. Soueidan that he was no longer a Ph.D. student because of the same professor who had discouraged Mr. Soueidan from staying in the program. This student indicated that he overheard this professor in his lab bragging to other students about how he had "ruined" Mr. Soueidan's Ph.D. career. Ultimately, this student also downgraded from a Ph.D. program to a Master's program even though he had come to SLU with a Master's degree in engineering. Mr. Soueidan finally realized there was no route for him to succeed as a student in the SLU Ph.D. program and, thus, officially downgraded to a Master's degree in the fall 2016 semester, after over four years in the Ph.D. program.

20.     In January 2017, Mr. Soueidan presented his thesis work at the AIAA SciTech 2017 conference in Dallas, Texas, and received enthusiastic feedback from industry senior scientists,

4

practicing engineers, and university professors.  Due to this praise he received about his research, Mr. Soueidan decided to speak to someone outside of the SLU Parks College of Engineering about his situation because he had discussed it with many people within the SLU College of Engineering without receiving any support whatsoever.

21. In a last ditch effort to obtain the Ph.D. degree he was promised, Mr. Soueidan contacted the SLU President's office and spoke with the Provost of academic affairs about his situation. The Provost was shocked to learn about what had happened and said he had not seen a student go through that in his 20 years as a professor at SLU.

22. The Provost reviewed Mr. Soueidan's academic record, which showed each semester that he was in "good standing" with the Ph.D. program.  During the meeting, the Provost told Mr. Soueidan that he should leave SLU to join a new program and that the Provost would help him to get his dissertation credits expenses refunded.

23. However, after the Provost spoke with the Dean of the College of Engineering he encouraged Mr. Soueidan to stay in the Ph.D. program and advised him to find an established research project.  Neither Mr. Soueidan nor the Provost were able to find one, even though Mr. Lebeau led Mr. Soueidan to believe that Mr. Soueidan already had an established research project that he had worked on for years and presented at several conferences.

24. In February 2017, Mr. Soueidan took the Provost's advice and renewed his efforts to try to work with his former Ph.D. advisor, Professor Lebeau.  However, Mr. Lebeau continued to demonstrate a great amount of uncertainty with moving Mr. Soueidan forward with the requisite examination.

25. Mr. Lebeau finally pointed Mr. Soueidan to the guidelines in the Handbook that Mr. Soueidan had brought to his attention years before.  Mr. Lebeau stated, "We do it the way SLU does it," but he continued to demonstrate a lack of familiarity with the exam format and procedures. Accordingly, Mr. Soueidan determined he had no choice but to start all over in a new Ph.D. program at a different university in order to obtain the degree he should have received from SLU after five years in their "Ph.D. program."

26. The Handbook obligates SLU to follow certain policies and procedures in its relationship with Mr. Soueidan. However, SLU consistently and capriciously ignored its own stated institutional policies, regulations and contracts set forth governing its relationship with students.

27. Section 3 of the Handbook covers policies regarding advisors. The Handbook indicates, "You should have an advisor assigned within the first few weeks of classes starting." Handbook, page 9. Despite this clear policy that the school shall assign students an advisor within the first few weeks of the program, SLU did not assign an advisor to Mr. Soueidan.

28. Mr. Soueidan was unable to find an advisor himself until Mr. Lebeau agreed to fill the role in December 2013, a year and a half after Mr. Soueidan began the Ph.D. program. Lacking an advisor during his first three semesters at SLU was, in fact, detrimental to Mr. Soueidan's ability to successfully complete his Ph.D. degree because he was supposed to have completed his Ph.D. Qualifying Exam Petition Form by the end of his first year. Handbook, page 7.

29. The Handbook also indicates that students are to meet with their advisor in January to complete their Annual Student Review. Handbook, page 9. This review would have been an opportunity for Mr. Soueidan to "have a review of [his] work completed, create goals for the next year of studies and research, *and ensure you are staying on track for graduation*." Handbook, page 9 (emphasis added).

30. Mr. Soueidan missed out on these important aspects of the Ph.D. program all because SLU failed to meet their obligation to provide him an advisor within the first few weeks of beginning the program. Such unlawful action by SLU made it very unlikely from the beginning that Mr. Soueidan would be able to achieve his Ph.D. degree at SLU.

31. The Handbook also indicates on page 12 that, "For Engineering students, the Qualifying Exam is scheduled after 2 semesters," and that "[t]he Qualifying Exam is designed to determine if the student is prepared to continue Ph.D. studies and carry on with research." Handbook, page 12. Since Mr. Soueidan still lacked an advisor after two semesters, the Qualifying

. . .

6

Exam was never scheduled, and, as a result, Mr. Soueidan missed out on another opportunity to ensure he was on track to obtain a Ph.D.

32. Somehow, Mr. Lebeau neglected to have Mr. Soueidan take the Qualifying Exam until August 2016, at the start of his *fifth* year at SLU.  By that late in his program, two of the committee members had already targeted him not to receive a Ph.D. and, in fact, told Mr. Lebeau that they would not pass him on this very late Qualifying Exam.  Additionally, Mr. Lebeau himself had very little understanding of the Qualifying Exam procedure and did not even know how to prepare Mr. Soueidan properly for it.

33. The 2015-2016 SLU Graduate Education Catalog (hereinafter referred to as, the "Catalog") indicates that the Parks College of Engineering does in fact have a Ph.D. program. Catalog, page 111.

34. However, in practice, students who register for the SLU College of Engineering Ph.D. program are faced with insurmountable hurdles that make it essentially impossible to actually obtain a Ph.D.  One such hurdle is the fact that there are not sufficient professors with funding or research to serve as advisors to these Ph.D. students, as was the case with Mr. Soueidan. SLU is well aware of this systemic problem as many administrators, including the provost himself, indicated to Mr. Soueidan that he should not be there.

35. Nonetheless, SLU continues to take tuition payments from these Ph.D. students who are, all the while, ignorant to the fact that they will never be able to obtain a Ph.D. from SLU. As a prospective student, Mr. Soueidan had a right to rely upon the Catalog and that is what he did when enrolling in the Ph.D. program at SLU.

36. Accordingly, SLU's representation of an attainable Ph.D. program amounts to fraud and that fraud cost Mr. Soueidan nearly $200,000.00 in tuition payments timely and faithfully made and 5 years of his life, all for a useless second Master's degree.  As such, Mr. Soueidan has been forced to retain legal counsel to obtain recourse.

. . .

. . .

## FIRST CAUSE OF ACTION
### *BREACH OF CONTRACT*

37. Plaintiff reincorporates by this reference each and every preceding paragraph as if fully restated herein.

38. By admitting Mr. Soueidan and accepting his tuition payments, Defendant has an express and implied contract with Mr. Soueidan in connection with rights explicitly guaranteed by SLU pursuant to the Handbook and also the Catalog.

39. Defendants' actions constitute a material and substantial breach of the express and implied contract by:

(a) failing to assign a Ph.D. advisor to Mr. Soueidan within the first few weeks of classes starting pursuant to the official policy set forth in the Handbook, page 9.

(b) failing to have an advisor meet with Mr. Soueidan in January each year to complete his Annual Student Review pursuant to the official policy in the Handbook, page 9.

(c) neglecting to schedule the Qualifying Examination after two semesters pursuant to the official policy set forth in the Handbook, page 12.

(d) failing to award Mr. Soueidan the Ph.D. degree he was promised after completing all directives and 5 years of requisite coursework.

40. Defendant's actions constitute a material and substantial breach of the express contract.

41. At all times relevant, Mr. Soueidan abided by and governed his conduct by the terms of the aforementioned contract and timely met all of his financial obligations.

42. As a direct and proximate result of Defendant's actions, Mr. Soueidan has lost the difference in value over a lifetime of earnings expected to be earned by an individual who obtained a Ph.D. degree from SLU and a person without a Ph.D. degree from SLU.

43. As a direct and proximate result of Defendant's actions, Mr. Soueidan has lost four years or more of his career and tuition he paid to SLU.

44. As a result of the breach committed by Defendant against Mr. Soueidan, he has suffered and continues to suffer loss, damage and detriment, including, without limitation, incidental and consequential damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

45. It has been necessary for Mr. Soueidan to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

## SECOND CAUSE OF ACTION

### *BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING*

46. Plaintiff reincorporates by this reference each and every preceding paragraph as if fully restated herein.

47. The aforementioned contract between the parties contained an implied covenant of good faith and fair dealing, which precludes Defendant from evading the spirit of the contract, willfully rendering imperfect performance, refraining from interference with Mr. Soueidan's ability to benefit from its terms, acting in contravention of Mr. Soueidan's reasonable expectations, failing to abide by the standards and policies promulgated by the Defendant, or otherwise acting in an arbitrary and capricious manner with respect to Mr. Soueidan.

48. Defendant breached this implied covenant of good faith and fair dealing by making it impossible for Mr. Soueidan to realize the benefit of his contract and by permitting its agents to act in bad faith and in a manner that interfered with Mr. Soueidan's contractual expectations.

49. As a result of the breach committed by Defendant against Mr. Soueidan, he has suffered and continues to suffer loss, damage and detriment, including, without limitation, incidental and consequential damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00).

50. It has been necessary for Mr. Soueidan to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

## THIRD CAUSE OF ACTION

### *FRAUDULENT MISREPRESENTATION*

51. Plaintiff reincorporates by this reference each and every preceding paragraph as if fully restated herein.

52. The 2015-2016 SLU Graduate Education Catalog falsely indicates on page 111 that students may obtain a Ph.D. degree there.

53. In practice, students who register for the SLU College of Engineering Ph.D. program are faced with insurmountable hurdles that make it effectively impossible to actually obtain a Ph.D.

54. SLU knew that these representations were false and made them to induce Mr. Soueidan into paying tuition to SLU and continuing to pay tuition to SLU for 5 years in the Ph.D. program.

55. Mr. Soueidan reasonably and justifiably relied upon Defendant's false representations in timely paying said funds to Defendant and was ignorant of the falsity of the misrepresentations.

56. Defendant intended to coerce Mr. Soueidan into paying tuition to SLU for a Ph.D. degree he would never obtain.

57. As a result of the fraud committed by Defendant against Mr. Soueidan, he has been damaged.

58. As a result of Defendant's intentional and malicious actions, Mr. Soueidan is entitled to an award of punitive and treble damages.

59. As a result of Defendant's intentional conduct, it has been necessary for Mr. Soueidan to obtain the services of an attorney to prosecute this action, and he is entitled to an award of attorney's fees and costs of suit incurred herein.

**WHEREFORE,** Plaintiff AHMED SOUEIDAN prays that this Honorable Court enter judgment in his favor, and against Defendant SLU, for (1) for compensatory damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) to be determined at trial; (2) for punitive

and treble damages in an amount in excess of Seventy Five Thousand Dollars ($75,000.00) to be determined at trial; (2) for the costs and disbursements of this action, for interest, and attorney's fees and further relief as justice requires; and (3) any such other and further relief that justice so requires.

## JURY DEMAND

Plaintiff respectfully prays for a trial by jury on all issues so triable.

DATED this 27th day of November, 2017.

          /s/ Jason J. Bach
Jason J. Bach, Esq. (pro hac vice pending)
**THE BACH LAW FIRM, LLC**
7881 W. Charleston Blvd., Suite 165
Las Vegas, Nevada 89148
Telephone:  (702) 925-8787
Facsimile:  (702) 925-8788
Email:  jbach@bachlawfirm.com

## VERIFICATION

As to those allegations of fact not qualified by the phrase "upon information and belief" or otherwise, I do solemnly declare and affirm under penalties of perjury that the contents of the foregoing Complaint are true and accurate to the best of my knowledge.

Ahmed Soueidan
Dated this 19 day of November, 2017